UNITED FARM WORKERS NATIONAL UNION on behalf of itself and its members, et al., Plaintiffs,

v.

Bruce BABBITT, Governor of the State of Arizona, et al., Defendants,

Arizona Farm Bureau Federation, an Arizona Corporation, et al., Intervenors.

Civ. No. 72–445 PHX–CAM.

United States District Court, D. Arizona.

April 20, 1978.

Michael W. L. McCrory, Los Angeles, Cal., for plaintiffs.

James Rutkowski, ACLU Foundation, Los Angeles, Cal., for Farm Workers.

John A. La Sota Jr., Atty. Gen. of Ariz., Jennings, Strouss & Salmon, Phoenix, Ariz., for intervenors-applicants.

William A. Gibney, Gen. Counsel, Agricultural Labor Relations Bd., Phoenix, Ariz., for defendants.

## OPINION AND ORDER

Before KILKENNY, Circuit Judge, and CRAIG and MUECKE, District Judges.

MUECKE, District Judge:

### STATEMENT OF THE CASE

Plaintiffs filed this action for declaratory and injunctive relief together with an application for a three-judge court under the provisions of 28 U.S.C. § 1343, 42 U.S.C. § 1983, and 28 U.S.C. § 2201, et seq., seeking to have Arizona's Agricultural Employment Relations Act (AERA), A.R.S. §§ 23–1381, et seq., declared unconstitutional.

Plaintiffs in this action are the United Farm Workers National Union (U.F.W.), on behalf of itself and its members; Gustavo Gutierrez, an agent of the U.F.W. in the State of Arizona; Ruben Alaniz and Matilda Varela, farm workers, on behalf of themselves and all other farm workers; and Wendy Rose, an individual supporter of the U.F.W., on behalf of herself and all other similarly situated U.F.W. supporters.

Defendants are Bruce Babbitt, Governor of the State of Arizona; Jack La Sota, Acting Attorney General; Bert Fleming, Treasurer; Raymond Long, Finance Commissioner; Gene Blake, William S. Borce, Jack Montgomery, Keith Walton, Jack McManus, Milton G. Sanders, individually and as members of the Arizona Agricultural Relations Board; and Theresa Bond, in her capacity as Executive Secretary of the Board.

The Arizona Farm Bureau Federation, the Arizona Grape Growers Association, the Vegetable Growers Association, all being Arizona corporations; and the Yuma Citrus Shipper's Association, an unincorporated association, all sought and were granted intervention in the suit on November 5, 1973.

Plaintiffs ask this Court to find that the Agricultural Employment Relations Act (AERA) violates the constitutional rights of the plaintiff U.F.W. and its members by restricting the exercise of their constitutional rights in several broad areas.

Provisions of the United States Constitution which plaintiffs claim are violated by the Act are the First and Fourteenth Amendments with respect to specific provi-

sions of the Act, which provisions it is alleged violate freedom of speech and assembly and the due process and equal protection clauses of the Constitution.

In particular, plaintiffs' arguments deal with nine separate issues and at least as many provisions of the AERA in support of their contention that the AERA is unconstitutional. Those issues and the statutory provisions dealt with are: (1) A.R.S. § 23–1385(B)(6) and (7) [generally dealing with secondary boycotts as an unfair labor practice]; (2) A.R.S. § 23–1385(B)(8) [publicity directed at the ultimate consumer regarding nonuse of agricultural product as an unfair labor practice]; (3) A.R.S. § 23–1385(B)(12) [recognitional picketing as an unfair labor practice]; (4) A.R.S. § 23–1389 [employee representation and election procedures]; (5) A.R.S. § 23–1385(C) [access by union to workers on employer property]; (6) A.R.S. § 23–1382(1) [exclusion of stitchers and haulers from AERA]; (7) A.R.S. §§ 23–1384, 23–1385(B)(11), 23–1385(D) [elimination of "management rights" from bargaining process]; (8) A.R.S. §§ 23–1385(B)(13), 23–1393(B) [restriction and prohibition against striking and picketing]; and finally, (9) A.R.S. § 23–1392 [criminal penalties for violation of the Act].

The defendants have disputed the unconstitutional effects of the AERA as claimed by plaintiffs, and have consistently argued that this challenge fails to present a justiciable claim, both as to the substantiality of the federal questions presented by plaintiffs, and because they argue no case or controversy is presented to the Court. They also ask that this Court abstain from deciding this case. As will become clear in this decision, the doctrine of abstention is not applicable to this case.

Defendants further claim that all testimony and other evidence received by this Court during the course of a four day nonjury trial on January 18, 19, 20, and 21, 1977, should be rejected by this Court as immaterial and completely conjectural and consisting of legal conclusions rather than factual evidence—even opinions and testimony given by the defendants' own experts.

As to this last point, defendants impose too restrictive a view on the admissibility and character of the evidence submitted in this case. Under Rules 701, 702, 703, and 704 of the Federal Rules of Evidence, much of the testimony of the experts relied upon by both parties is admissible either as of the type reasonably relied upon by experts in the particular field in forming opinions or inferences on the subject, or of the kind of specialized knowledge that assists the trier of fact in determining facts in issue, ultimate or otherwise.

A pertinent example would be the opinions expressed by the experts of both sides as to time periods to be expected in the operation of various provisions of the Act, the length of growing seasons, facts growing out of their personal experiences with organizing unions, or in the operation of analogous statutes, i. e., the National Labor Relations Act or the California Agricultural Labor Relations Act.

Again as to this last point, i. e., testimony concerning operation of the analogous statutes, what is admissible as to this line of testimony is not an opinion of the expert as to the legal effect of the particular provision of the AERA, but rather, given a particular interpretation of a provision, a hypothetical if you will as to the legal effect of a provision, the opinion of the expert as to the practical effect of such an interpretation based on his previous experience and expertise *is* admissible *if* the legal premise on which the question is based is accepted by the court. Even if a hypothetical question as such is not asked, but it is obvious that the opinion of the expert is based on a certain interpretation of a statutory provision, which the court accepts as the appropriate interpretation, then the interpretation and resultant opinion testimony based on this interpretation is admissible. *Burlington Northern, Inc. v. Boxberger*, 529 F.2d 284, 286–87 (9th Cir. 1975); *United States v. School District 151, etc.*, 404 F.2d 1125, 1134–35 (7th Cir. 1968); *Confederated Tribes of Warm Springs Reservation v. United States*, 177 Ct.Cl. 184 (1966).

Evidence presented during the four day trial was introduced relative to A.R.S. §§ 23–1384, 1385(A)(5), 1385(B)(11), 1385(D), 1389, and on the plaintiffs' claim that the exclusion of stitchers and haulers and sixteen-year olds from the AERA, § 1382(1) and 1382(1)(g), was a violation of the Equal Protection Clause as well as a similar claim that exclusion of those farm workers who did not work for the same employer the previous calendar year from representation elections was likewise a violation of the Equal Protection Clause.

## JURISDICTION

As a result of foundation questions asked of the witnesses, Caesar Chavez, Stanley Lubin, George W. Campbell, and James W. Cherry, this Court accepts all four as experts competent to give the opinions to which they testified.

It is the opinion of the Court that evidence need only be considered with respect to A.R.S. § 23–1389, the provision of AERA dealing with "Representations and elections," and with respect to A.R.S. § 23–1385(C). However, before setting forth the Court's findings as to these facts, the initial issue raised by defendants, namely, their allegation that this Court does not have jurisdiction because there is not a substantial federal question or a case or controversy presented to this Court by plaintiff's challenge to the AERA, will be settled.

Defendants in consistently espousing this view, that this Court does not have jurisdiction, have again emphasized in their argument that a single judge would have had jurisdiction to dismiss this case upon the Article III grounds and that this holds true even more so with the three-judge court.

The lack of jurisdiction motion was initially denied by the district judge prior to the empanelling of a three-judge court. Then the matter remained unresolved by this panel because of plaintiffs' contentions that the AERA was invalid on its face as overbroad and vague with respect to alleged infringement of constitutional rights. This, coupled with the criminal penalty provisions and the complexity of the case,

made postponement of the jurisdiction question until after the trial a reasonable course of action. In so ruling we left Article III open as a threshold question and could proceed to a decision on the merits once jurisdiction was settled.

Plaintiffs' response to defendants' Article III attack is that such attack is not valid because of the "Stipulation Regarding Enforcement of the Act," filed by the parties, which reflects some seven suits have been filed against the plaintiff (U.F.W.) and its members and supporters based on sections of the AERA, and that as a result speech activities have been enjoined including handbilling and oral conversations—on three occasions by an *ex parte* temporary restraining order without notice or hearing.

In addition, plaintiffs argue that the Board itself has initiated charges against the U.F.W. which resulted in limitations on plaintiffs' rights. Finally, plaintiffs note that in *Roy's Liquor, et al. v. United Farm Workers* (set forth in the said stipulation), the Board apparently held they had no jurisdiction to consider challenges to the constitutionality of the Act.

From these examples cited by plaintiffs, and not controverted precisely by defendants, it must be concluded that this case is not hypothetical, abstract, or generalized.

As the court said in *Rescue Army v. Municipal Court*, 331 U.S. 549, 67 S.Ct. 1409, 91 L.Ed. 1666 (1947), a case or controversy is created by a showing that one is injured by the statute's operation or that a construction of the statute to avoid the constitutional questions is impossible. Certainly a challenge for facial invalidity meets the *Rescue Army* test.

In addition to those matters contained in the stipulation, there is the matter of the criminal penalty provision of the statute, which reads as follows:

§ 23–1392. *Penalties.*

Any person who willfully resists, prevents, impedes or interferes with any members of the board or any of its agents or agencies in the performance of duties pursuant to this article, or who violates

any provision of this article is guilty of a misdemeanor punishable by a fine of not more than five thousand dollars, by imprisonment for not more than one year, or both. Provided, however, that none of the provisions of this section shall apply to any activities carried on outside the state of Arizona.

It would appear on the face of this provision of the AERA that it cuts across and covers the entire Act, not just a limited area where a criminal penalty might be acceptable. It says in plain English that it applies to "any person" and further to any person "who violates any provision of this article is guilty of a misdemeanor . . ."

■ Considering the enormous variety of activities covered by the Act, and the fact that (as will be more fully discussed later) many of these involve First and Fourteenth Amendment constitutional rights, it is clearly a statutory provision so vague that men of common intelligence can only guess at its meaning. Conduct can only be prohibited and punished by certain, clear statutes, and such precision is necessary so that "the ordinary person can know how to avoid unlawful conduct." *U. S. v. Sullivan,* 332 U.S. 689, 68 S.Ct. 331, 92 L.Ed. 297 (1948). Even closer scrutiny is warranted where the regulation covers freedom of speech. *Ashton v. Kentucky,* 384 U.S. 195, 86 S.Ct. 1407, 16 L.Ed.2d 469 (1966).

In an area where application of a penal statute may restrict freedoms protected against state invasion by the Fourteenth Amendment's incorporation of the Bill of Rights, the U. S. Supreme Court has been constantly vigilant and protective of these rights.

The objectionable quality of vagueness and overbreadth does not depend upon absence of fair notice to a criminally accused or upon unchanneled delegation of legislative powers, but upon the danger of tolerating, in the area of First Amendment freedoms, the existence of a penal statute, susceptible of sweeping and improper application. *NAACP v. Button,* 371 U.S. 415, 432–3, 83 S.Ct. 328, 338, 9 L.Ed. 405 (1963).

The overbroadness and vagueness already discussed are compounded by the provision that the U.F.W. is bound by the acts of its agents and whether or not the acts so performed "were actually authorized or subsequently ratified shall not be controlling." A.R.S. § 23–1393(F). Since the Act restricts the U.F.W. and its agents, and provides criminal penalties for violation by any person, the U.F.W. could be subject to sanctions regardless of its relationship to the agent.

There is no way for anyone to guess whether criminal provisions will apply to any particular conduct, in advance, and it is clear that the statute is unconstitutionally vague and does not adequately define prohibited conduct and is, therefore, in violation of the due process clause of the Fourteenth Amendment. *Whitehall v. Elkins,* 389 U.S. 54, 88 S.Ct. 184, 19 L.Ed.2d 228 (1967); *Keyishian v. Board of Regents,* 385 U.S. 589, 87 S.Ct. 675, 17 L.Ed.2d 629 (1967); *Elfbrandt v. Russell,* 384 U.S. 11, 86 S.Ct. 1238, 16 L.Ed.2d 321 (1966); *NAACP v. Alabama,* 357 U.S. 449, 78 S.Ct. 1163, 2 L.Ed.2d 1488 (1958); *Conally v. General Construction Co.,* 269 U.S. 385, 46 S.Ct. 126, 70 L.Ed. 322 (1926).

Recently the U. S. Supreme Court considered the case or controversy issue in the context of a challenge to a criminal statute. In *Doe v. Bolton,* 410 U.S. 179, 93 S.Ct. 739, 35 L.Ed.2d 201 (1973), the Supreme Court addressed the question whether a licensed physician's challenge to a Georgia anti-abortion statute presented a justiciable controversy. In that case, there was no record of a pending or threatened criminal prosecution and the Act had not been enforced against the plaintiffs. Still the court found a controversy did exist and reversed the lower court's dismissal saying:

The physician is the one against whom these criminal statutes directly operate in the event he procures an abortion that does not meet the statutory exceptions and conditions. The physicians-appellants, therefore, assert a sufficiently direct threat of personal detriment. They

should not be required to await and undergo criminal prosecution as the sole means of seeking relief. *Crossen v. Breckenbridge,* 446 F.2d 833, 839, 839–840 (6th Cir. 1971); *Poe v. Menghini,* 339 F.Supp. 986, 990–991 (Kan.1972).

Throughout their arguments the intervenors and defendants have argued that there is no case or controversy here since no criminal prosecution has been commenced against the plaintiffs.

At the same time, as their memorandum reveals, they are also aware that were there pending criminal cases against the plaintiffs under AERA, this Court would hesitate to take jurisdiction for reasons of equity, comity, and federalism.

Yet courts have found case or controversies when criminal statutes were challenged as overbroad even before the acts went into effect or there had been any enforcement. *Wounded Knee Legal Defense/Offense Committee v. F.B.I.,* 507 F.2d 1281 (8th Cir. 1974); *Brown v. Brannon,* 399 F.Supp. 133, aff'd 535 F.2d 1249 (4th Cir. 1975); *Hjelle v. Brooks,* 377 F.Supp. 430 (D.Alaska 1974); *Stoner v. Miller,* 377 F.Supp. 177 (E.D.N.Y. 1974); *Associated Students, University of California at Riverside v. Attorney General of the United States,* 368 F.Supp. 11 (C.D. Cal.1973); *Valley Health Systems v. City of Racine,* 369 F.Supp. 97 (E.D.Wis.1973); *Mortillaro v. State of Louisiana,* 356 F.Supp. 521 (E.D.La.1972).

The significance of these cases is clear; that is, if plaintiffs are persons against whom the particular criminal statute directly operates, and whether they assert a sufficiently direct threat of personal detriment.

There can be no question that the plaintiffs in the present lawsuit are precisely those persons and organizations whose activity the penal statute was designed to regulate, and they have asserted a direct threat of personal detriment both through its past enforcement as well as the threat of its continued enforcement.

■ It is true that A.R.S. § 23–1392 of the AERA relating to penalties is severable, and that if so severed and declared invalid, the rest of the Act could stand as it is not dependent for its operation upon this section. However, it is sufficient in and of itself as being unconstitutionally invalid and void on its face to give this Court jurisdiction and create a case or controversy.

■ If the plaintiffs are correct in their contentions that many provisions of the AERA are unconstitutional and void on their face, then a substantial federal question exists as to the constitutional rights that are infringed upon by the AERA and this Court would have jurisdiction. However, if defendants maintain that any sections of the Act found to be unconstitutional are severable, then the remainder of the Act could stand as operable law.

Where it is not possible to separate that part of a law which is unconstitutional from the rest of the law, the whole law fails. *Lynch v. U. S.,* 292 U.S. 571, 54 S.Ct. 840, 78 L.Ed. 1434 (1934); *Hill v. Wallace,* 259 U.S. 44, 42 S.Ct. 453, 66 L.Ed. 822 (1922); *Harrison v. St. Louis & S.F.R. Co.,* 232 U.S. 318, 34 S.Ct. 333, 58 L.Ed. 621 (1914); *Gherma v. State,* 16 Ariz. 344, 146 P. 494 (1915).

A law is void on its face if it does not aim specifically at evils within the allowable area of governmental control, but sweeps within its ambit other activities that constitute an exercise of protected expressive or associated rights. (see: "The First Amendment Overbreadth Doctrine" 83 Harv.L. Rev. 844 (1970).)

A plausible challenge to a law as void for overbreadth can thus be made when (1) the protective activity is a significant part of the law's target, and (2) there exists no satisfactory way of severing the law's constitutional from its unconstitutional applications so as to excise the latter clearly in a simple step from the law's reach.

In laws having these two characteristics, the usual approach of constitutional adjudication—gradually cutting away the unconstitutional aspects of a statute by invalidating its improper applications case by case—does not respond sufficient-

ly to the peculiar vulnerable character of activities protected by the first amendment. For an "overbroad" law of the sort described here "hangs over [people's] heads like a Sword of Damocles." *Arnett v. Kennedy,* 416 U.S. 134, 231, 94 S.Ct. 1633, 40 L.Ed.2d 15 (1974). That judges will ultimately rescue those whose conduct in retrospect is held protected is not enough, "for the value of a Sword of Damocles is that it hangs—not that it drops." The resulting deterrent to protected speech is not effectively removed if "the contours of regulation would have to be hammered out case-by-case and tested only by those hardy enough to risk criminal prosecution [or other sanctions] to determine the proper scope of regulation. *Dombrowski v. Pfister,* 380 U.S. 479, 487, 85 S.Ct. 1116, 14 L.Ed.2d 22 (1965). The only solution, then, is to strike down such an overbroad law altogether. . . . This result may be understood as an exception to the rule that individuals are not ordinarily permitted to litigate the rights of third parties, since an individual whose conduct may not itself be protected by the first amendment is awarded a judicial victory on the claim of a law's potential unconstitutional applications to the conduct of persons not before the court. *American Constitutional Law,* Laurence H. Tribe, The Foundation Press, 1978.

## CONCLUSIONS OF LAW

After consideration of the many-pronged attack made by plaintiffs on the constitutionality of the various provisions of the AERA, and the defendants' response thereto, this Court finds and concludes that the Agricultural Employment Relations Act, A.R.S. §§ 23–1381, et sequence, is unconstitutional in its entirety for the reason that A.R.S. §§ 23–1385(B)(8), 23–1392, 23–1393(B) are unconstitutional and void on their face, and A.R.S. §§ 23–1385(C) and 23–1389 are likewise unconstitutional when considered in context with the testimony and other evidence presented, and these sections are found to be in violation of the First and Fourteenth Amendments 'to the

Constitution of the United States and in violation of the freedom of speech and assembly provisions and of the due process and equal protection clauses with A.R.S. § 23–1393(B) also found to be in violation of the Seventh Amendment providing for right to trial by jury and with the rest of the Act falling by reason of its inseparability and inoperability apart from the provisions found to be invalid.

## FINDINGS OF FACT

Turning now to the facts found by this Court to be pertinent to a consideration of the constitutionality of A.R.S. §§ 23–1385(C) and 23–1389.

The majority of agricultural employees as defined by the AERA are directly engaged in the planting, preparation and/or harvesting of row crops, field crops, tree fruits, and grapes. The greatest number of field workers employed by an agricultural employer are employed during the peak of the harvest season. This peak period is that time when fifty percent or more of the highest number of agricultural employees employed at any time during the harvest season are employed.

Most of the agricultural employees in Arizona, about seventy-five to eighty percent of the total man-days worked each year, are employed in the growing and harvesting seasonal fruits and vegetables. Major crops in this category include lettuce (approximately twenty percent), citrus (approximately twenty-two percent), grapes and deciduous trees (approximately five to ten percent), vegetables, other than lettuce, including green onions, dry onions, carrots, cauliflower, broccoli, cabbage, etc. (approximately twenty percent), and cantaloupes (approximately five to ten percent).

The length of the harvest season and times of peak employment are for the most part very short. The great majority of the lettuce crop in Arizona is harvested in separate spring and fall harvests. The length of these harvest seasons for any particular employer ranges from four to six weeks within which there is a period of peak employment of only three to four weeks.

The grape harvest occurs once annually and lasts from four to six weeks with a period of peak employment of three to four weeks.

Cantaloupes are harvested in from three to seven weeks with a peak of only two to three weeks while the dry onion harvest for any single agricultural employer usually takes about two to four weeks.

The citrus harvest in Arizona lasts for ten to eleven months, approximately from September to mid-July. Green onions may be harvested for as long as ten months of the year. Even in these latter crops, citrus and green onion, there are factors which make the period of employment of particular workers for a specific employer considerably shorter than the length of the total harvest. Employers do not always have each successive crop ready for harvest at the end of the harvesting of the preceding crops. Therefore, the work is intermittent and employees often must switch employers. Many of the workers are migratory who must leave an area immediately after a harvest to find other employment. Many employees do not return to the same employer in a following year so that each year there is a substantial change in the work force.

Green onions also involve an industry where there is tremendous turnover because workers are paid on a daily cash basis and because many minors are employed.

In citrus, crews are constantly moved from employer to employer throughout the harvest season picking only intermittently for any particular employer for from a few days to a few weeks.

If an election is to be held so that a majority of employees of a particular grower can participate, such an election must be held during the period of peak employment. To accomplish this, the law should assure that an election can be petitioned for during such peak periods, and that the procedures for holding elections does not extend in time beyond the period of peak employment.

Any labor organization seeking to organize Arizona agricultural workers employed in these industries must by reason of provisions of the AERA relating to the representation and election provisions of the AERA, and because of the very nature of the organizational process based on previous experience with analogous statutes, e. g., National Labor Relations Act and the California Agricultural Labor Relations Act, take certain periods of time to accomplish certain organizational goals.

For example, it takes approximately three to six weeks for a union to gather authorization cards to be submitted with a petition for a representation election. Activities which must be carried out by the union during this time include locating all the various fields of an employer, identifying his employees, contacting those employees, and informing and persuading them to sign authorization cards. This cannot be done until the harvest season has begun since there is a substantial turnover in employees from year to year and it is impossible to determine who will work for an employer until that person is actually found in the field. Also to protect employees from possible employer retaliations, organizing must be done at a time relatively near the election.

It is usually within an employer's power to delay the process of obtaining sufficient authorizations by employing coercive tactics to discourage union activities among his employees.

Much of the work of reaching agricultural employees must be done on the employer's property, since most agricultural employees are migrants with no permanent residence in the area and live in labor camps on the employer's premises.

The election procedures of the AERA are virtually identical to those of the National Labor Relations Act which, in a contested election, requires from six to seven weeks for completion.

The election provisions of the AERA call for a Board investigation of the petition, the setting and holding of a pre-election hearing upon demand of the employer, deci-

sion of issues raised at the hearing, and granting the employer ten days to provide a list of employees to the Board and the union.

The experience of the plaintiff U.F.W. in participating in over 400 elections in California in the agricultural industry was that it took from three to six weeks before petitions could be filed. Under NLRB experience the hearing is not held until from fourteen to twenty-one days after the petition is filed.

The six to seven week period between the filing of a petition and the holding of an election will be longer than many of the seasons of peak employment. When this period is added to the three to six weeks of work which must be done before a petition can be filed, the entire process cannot take place before the majority of the employees finish their work and leave their place of employment.

Experience under both the N.L.R.A. and in California employer-employee situations in the agricultural industry, has shown that some employers do utilize such coercive and intimidating tactics during elections that both the NLRB and the California Board have found that even after remedial action for unfair labor practices, it was impossible to hold a fair, uncoerced election.

In such situations it has been determined that the only way to preserve the employees' right to collective bargaining was to issue orders to bargain to the employer, absent an actual certification through a secret ballot election.

Absent such power to issue such bargaining orders, the Board, acting pursuant to the AERA, would be without adequate remedy to protect employee rights to collective bargaining. Since the AERA prohibits the Arizona Board from issuing such an order requiring an employer to bargain with a union, unless that union is certified through an election, the AERA encourages employers to commit those types of unfair labor practices which result in election coercion and in turn to a "no-union" vote. Such a practice could be engaged in year after year, effectively delaying any bargaining.

## REPRESENTATION AND ELECTION PROCEDURES

Having stated these facts, our consideration turns naturally to that provision of the Act most important to a consideration of its constitutionality. This is A.R.S. § 23–1389 (employee representation, recognition, and election procedures). For a full analysis of this point as well as an exhaustive analysis of the AERA, see: "State Regulation of Agricultural Labor Relations—The Arizona Farm Labor Law—an Interpretive and Comparative Analysis." Warren H. Cohen, Jonathan Rose. Law and the Social Order, 1973, pp. 313 through 431, at 322.

The stated legislative purpose of the Act as enunciated in its "Declaration of Policy," A.R.S. § 23–1381, is said to be:

> . . . the policy of this state that agricultural employees shall be free to organize, to take concerted action, and through representatives of their own choosing enter into collective bargaining contracts establishing their wages and terms and conditions of employment; . . . "

Such a stated policy is but a recognition of the First Amendment right to free speech, to assemble peaceably, and the due process right of all in America who desire to do so to participate and retain membership in a union. *Griswold v. Connecticut,* 381 U.S. 479, 85 S.Ct. 1678, 14 L.Ed.2d 510 (1965); *N.A.A.C.P. v. Alabama, ex rel. Paterson,* 357 U.S. 449, 78 S.Ct. 1163, 2 L.Ed.2d 1488 (1958); *Hagne v. CIO,* 307 U.S. 496, 59 S.Ct. 954, 83 L.Ed. 1423 (1939); *NLRB v. Jones and Laughlin Steel Corp.,* 301 U.S. 1, 57 S.Ct. 615, 81 L.Ed. 893 (1937); *Lontine, et al., v. Van Cleave,* 483 F.2d 966 (10th Cir. 1973); *American Federation of State, County & Municipal Employees v. Woodward,* 406 F.2d 137 (8th Cir. 1969); *McLaughlin v. Tilendis,* 398 F.2d 287 (7th Cir. 1968); *Thomas v. Collins,* 323 U.S. 516, 65 S.Ct. 315, 89 L.Ed.2d 430 (1945). See also "A Preliminary Survey of the Arizona Farm Labor Act," Robert A. Kerry, *Arizona Law Review,* Vol. 14, No. 4, p. 766 at 801.

458

The section in question reads as follows:

§ 23–1389. *Representatives and elections.*

A. Representatives selected by a secret ballot for the purposes of collective bargaining by the majority of the agricultural employees in a unit appropriate for such purposes shall be the exclusive representatives of all the agricultural employees in such unit for the purpose of collective bargaining in respect to rates of pay, wages, hours of employment or other conditions of employment. If ratification of any such contract is required, the right to vote in such ratification shall be limited to the employees in the bargaining unit. Any individual agricultural employee or a group of agricultural employees may at any time present grievances to their agricultural employer and have such grievances adjusted, without the intervention of the bargaining representative, if the adjustment is not inconsistent with the terms of a collective bargaining contract or agreement then in effect. The bargaining representative shall be given opportunity to be present at such adjustment.

B. The board shall decide in each case whether in order to ensure to employees the fullest freedom in exercising their rights the unit appropriate for the purposes of collective bargaining shall consist of either all temporary agricultural employees or all permanent agricultural employees of an agricultural employer working at the farm where such employer grows or produces agricultural products or both. In making unit determinations the extent of a union's extent of organization shall not be controlling. Principal factors should be the community of interest between employees, same hours, duties and compensation, the administrative structure of the employer and control of labor relations policies.

C. The board shall investigate any petition, and if it has reasonable cause to believe that a question of representation exists shall provide for an appropriate hearing upon due notice, when such petition has been filed in good faith in accordance with such regulations as may be prescribed by the board:

1. By an agricultural employee or group of agricultural employees or any individual or labor organization acting in their behalf alleging that thirty per cent or more of the number of agricultural employees in the unit in question either wish to be represented for collective bargaining and that their employer declines to recognize their representative or assert that the individual or labor organization which has been certified or is being currently recognized by their employer as the bargaining representative is no longer a representative.

2. By an agricultural employer, alleging that one or more individuals or labor organizations have presented to him a claim to be recognized as the representative or that an individual or labor organization which has previously been certified as the bargaining representative is no longer a representative.

D. If the board finds upon the record of such hearing that a question of representation exists, it shall direct an election by secret ballot and shall certify the results thereof. If a second labor organization files a petition for an election alleging that thirty per cent or more of the employees in the unit in question desire to be represented by that labor organization, then the board shall require that the names of both labor organizations shall appear on the ballot. In any election the voters shall be afforded the choice of "no union". If in a representational election where more than one union is on the ballot, and none of the choices receives a majority vote, a second election shall be held. The second election shall be between the union receiving the highest number of votes and "no union". In any election a labor organization shall obtain a majority of all votes cast in that election in order to be certified as the bargaining representative of all the employees in that unit.

E. In determining whether or not a question of representation exists, the same regulations and rules of decision shall apply irrespective of the identity of the persons filing the petition or the kind of relief

sought. In no case shall the board deny a labor organization a place on the ballot by reason of an order with respect to such labor organization or its predecessor not issued in conformity with § 23–1390.

F. Within five days of receipt of such a petition, the agricultural employer may file a challenge to such petition on the ground that the authorization for the filing of such petition is not current or that such authorization has been obtained by fraud, misrepresentation or coercion. Such petition shall not act to stay the election proceeding but if it is thereafter determined that the authorizations are not current or obtained by fraud, misrepresentation or coercion the petition will be dismissed.

G. No election shall be directed or conducted in any bargaining unit or any subdivision thereof within which, in the preceding twelve-month period, a valid election shall have been held. Employees engaged in an economic strike who are not entitled to reinstatement shall be eligible to vote under such regulations as the board shall find are consistent with the purposes and provisions of this article in any election conducted within three months after the commencement of the strike. Any agricultural employee who is found to have sought or accepted employment only for the purpose of affecting the outcome of an election shall not be eligible to vote in an election conducted pursuant to the provisions of this article for a period of twelve months from the date of that election.

H. Nothing in this section shall be construed to prohibit the waiving of hearings by stipulation for the purpose of a consent election in conformity with regulations and rules of decision of the board.

I. The agricultural employer, within ten days after an election is directed by the board or a consent election agreement is approved by the board and on request of the board, shall furnish to the board a list of agricultural employees in the bargaining unit who are qualified to vote, and such a list shall be made available to the organizations or other interested employees involved in the election.

J. Upon the filing with the board, by thirty per cent or more of the agricultural employees in a bargaining unit covered by a certification or by an agreement between their employer and a labor organization made pursuant to § 23–1385, of a petition alleging the desire that such representation authority be rescinded, the board shall conduct an election by secret ballot of the employees in such unit and certify the results thereof to the labor organization and to the employer.

This section of the AERA is the threshold over which employees must pass if they desire to exercise their constitutional right to ". . . organize . . . take concerted action . . . through representatives of their own choosing. . . ."

If this section fails, the rest of the Act must fail, since most of the use of the Act would apply only if farm workers were initially free to organize and not if the exercise of such a constitutional freedom of assembly were made impossible.

■ Essentially, this provision of the Act must be found constitutionally invalid as being in violation of the First and Fourteenth Amendments to the Constitution, because of the excessive length of the procedures permitting delays of unit representation elections coupled with the seasonal nature of agricultural labor.

The constant flux of workers to job sites, the broken routines, the mobility and interchange with different employers, and the short span of working periods during peak employment periods when the majority of workers in a proposed unit are employed by a grower, make it impossible for the Agricultural Employment Relations Board to conduct a timely election to effect the purposes of the Act.

Representation and recognition by the union, and the requirement that an employer bargain with the union, can only be achieved if the union is chosen to represent the employees through the election procedures set out in the A.R.S. § 23–1385(A)(5). Before an election can be held, the union must first demand and be denied recogni-

tion by the employer. A.R.S. § 23–1389(C)(1). There is no time set out in the law within which the employer must answer this request.

If the employer does not petition for an election, and denies a request for recognition, then the union must petition for an election showing that at least thirty percent of the employees in the unit wish to be represented by the union. A.R.S. § 23–1389(C)(1). · If the AERA Board has reasonable cause to believe that a sufficient number of workers desire to have a union to represent them to justify an election, it will set a pre-election hearing. Again no time period is provided in the Act for how soon the Board must act. Since time for such notice is not provided, the general application of the Arizona Administrative Procedure Act stamps a twenty day period (A.R.S. § 41–1009) on how soon the hearing will be held.

If at the hearing, the Board determines there is a question of representation, it will direct an election by secret ballot. Again there is no provision setting the time within which the election must be held.

Once the Board has fixed the time for a union election, the employer has ten days to submit to the Board a list of his employees eligible to vote. A.R.S. § 23–1389(I). Then the election must be by secret ballot. If the union wins a majority of the votes cast, it will be certified by the Board as the representative for that unit and the employer will be required to bargain collectively with the union. § 23–1385(A)(5); see also § 23–1385(D).

The Board is directed by the AERA to form the unit from either all "permanent" employees, all "temporary" employees or both. A.R.S. § 23–1389(B). Permanent employees are defined as those "over sixteen years of age who . . . [have] . . . been employed by a particular agricultural employer for at least six months during the preceding calendar year." A.R.S. § 23–1382(1).

The Board is also directed to form the bargaining unit from employees "working at the farm." A worker could thus be a "permanent" employee but still be excluded from voting because while having worked for the employer for at "least six months during the preceding calendar year," he was not employed at the time of the election (and we take calendar year to have its plain meaning of being a year extending from January through December so that this provision clearly means that a worker must have been employed during the twelve months preceding January 1 of the year in which the election is held).

A temporary employee is defined as "over sixteen years of age . . . employed by a particular agricultural employer and who has been so employed during the preceding calendar year." A.R.S. § 23–1382(1).

Again, a worker not currently employed even though he worked the previous calendar year for the employer could not vote.

In· any event, it is also clear from these provisions that many other migratory workers could not vote, even though presently employed, simply because they had not worked for the employer in a particular unit, either for six months or at any time during the preceding calendar year—the practical effect being that a particular worker must be employed during two successive harvests before being entitled to vote.

These categories of employees eligible to vote set forth in the Act, would appear to be so defined as to preclude a significant and substantial number from participating in the collective bargaining process, from selecting representatives of their own choosing, given the migratory and transitory nature of agricultural employment.

A second and most significant consequence of determining the unit solely on the basis of the eligible employees as defined by the Act, is that an election in any unit will be a bar to another election for twelve months. A.R.S. § 23–1389(G).

Groups of workers may thus be hired for the same unit at different times of the year, and yet an election among one group will bar an election by a group hired later in the year. An employer could, for exam-

ple, respond to a petition for an election filed by a small minority of his permanent, year-round employees, and if they should vote for no-union, then no matter how many hundreds or thousands of employees that employer hires for that unit, thereafter they are barred from holding another election for twelve months—clearly an absolute frustration of their right of free association.

Defendants have argued that even if an election were held before or after the peak period, the plaintiff union could object on the grounds that a non-representative electorate selected the collective bargaining representative. But here again, as if in anticipation of this kind of reaction, A.R.S. § 23–1385(B)(12) prohibits picketing or boycotting "(b) Where within the preceding twelve months a valid election under § 23–1389 has been conducted." or "(c) Where a petition has been filed under § 23–1389."

As noted in the earlier findings, another difficulty arising out of a procedure which makes an election (aside from dubious consent by an employer) the sole procedure for establishing union recognition and representation is that the ballot procedure is subject to disruption by the employer and thus could effectively frustrate any such recognition or representation ever being achieved.

This problem has been well recognized by the courts, and where an election is not a feasible alternative, the NLRA and the courts have recognized the validity of informal methods of designating a union for ordering collective bargaining and an essential method of preserving the rights of employees. *Linden Lumber Division v. NLRB,* 419 U.S. 301, 95 S.Ct. 429, 42 L.Ed.2d 465 (1974); *NLRB v. Gissel Packing Co.,* 395 U.S. 575, 89 S.Ct. 1918, 23 L.Ed.2d 547 (1969); *Bishop v. NLRB,* 502 F.2d 1024 (5th Cir. 1974); *NLRB v. Big Three Industries,* 497 F.2d 43 (5th Cir. 1974); *NLRB v. Kaiser Agr. Chem. Div. of Kaiser A & C Corp.,* 473 F.2d 374 (5th Cir. 1973); *J. P. Stevens & Co., Inc., Gilistan Division v. NLRB,* 441 F.2d 514 (5th Cir. 1971); *NLRB v. Drives Inc.,* 440 F.2d 354 (7th Cir. 1971).

The Ninth Circuit, in following *NLRB v. Gissel Packing Co., supra,* noted that without ultimate authority to order collective bargaining regardless of election results, the statutory procedures themselves become an aid to an employer's attempt to prevent unionization. *NLRB v. L. B. Forster Co.,* 418 F.2d 1 (9th Cir. 1969).

Thus the absence in the AERA of any feasible alternative to a secret ballot election is in effect a condonation and an encouragement to intentional interference by the employer in the election process which could effectively prevent any meaningful election from ever being held, again frustrating the right to free assembly and association.

We next consider additional bases for conferring jurisdiction upon this Court, namely, whether there is any other section or sections of the AERA that are constitutionally invalid on their face so that there is a further substantial federal question presented.

We find this to be true of three sections: A.R.S. § 23–1385(B)(8), A.R.S. § 23–1385(C), and A.R.S. § 23–1393(B).

### CONSUMER PUBLICITY

The first deals with consumer publicity and reads in pertinent part:

§ 23–1385. *Unfair labor practices.*

B. It shall be an unfair labor practice for a labor organization or its agents:

8. To induce or encourage the ultimate consumer of any agricultural product to refrain from purchasing, consuming or using such agricultural product by the use of dishonest, untruthful and deceptive publicity. Permissible inducement or encouragement within the meaning of this section means truthful, honest and nondeceptive publicity which identifies the agricultural product produced by an agricultural employer with whom the labor organization has a primary dispute. Permissible inducement or encouragement does not include publicity directed against any trademark, trade name or generic name which may include ag-

ricultural products of another producer or user of such trademark, trade name or generic name.

This provision of the AERA deals specifically with "truthful, honest and undeceptive publicity" and says if publicity is not of this character, it is an unfair labor practice. This section is no doubt intended to prohibit what is commonly referred to as consumer boycotts to be achieved by handbilling, picketing, orally, and other mediums of communication customarily employed by labor organizations.

First, it specifically prohibits inducing or encouraging an ultimate consumer to refrain from purchasing particular agricultural products "by the use of dishonest, untruthful and deceptive publicity." This section goes on to define permissible inducement "as truthful, honest, and nondeceptive publicity which identifies the agricultural product produced by an agricultural employer with whom the labor organization has a primary dispute."

Plaintiff argues (1) that the section unconstitutionally restricts speech activity because it makes all but truthful, honest, and nondeceptive publicity an unfair labor practice, and subjects a person or organization guilty of such practice to criminal penalties for violation where determination of "truth" is left to be decided by a tribunal after the utterance and thus creates a drill on the exercise of First Amendment rights, and that (2) the section's limitation on inducement by a union to products produced by the agricultural employer with whom the union has a primary dispute restricts unconstitutionally the right of non-employees to communicate.

As to the first requisite, the U. S. Supreme Court has held on many occasions that truthfulness is not a prerequisite to First Amendment protection.

In *Organization for a Better Austin v. Keefe*, 402 U.S. 415, 91 S.Ct. 1575, 29 L.Ed.2d 1 (1971), the court said:

It is elementary, of course, that in a case of this kind the courts do not concern themselves with the truth or validity of the publication. *Under Near v. Minne-*

*sota*, 283 U.S. 697 [51 S.Ct. 625, 75 L.Ed. 1357 (1931)], the injunction, so far as it imposes prior restraint on speech and publication, constitutes an impermissible restraint on first amendment rights.

Again in *N. Y. Times v. Sullivan*, 376 U.S. 254, 84 S.Ct. 710, 11 L.Ed.2d 686 (1964), the court also indicated that First Amendment protections apply to other than just truthful statements.

Authoritative interpretations of the First Amendment guarantees have consistently refused to recognize an exception for any test of truth—whether administered by judges, juries or administrative officials—and especially one that puts the burden on proving the truth to the speaker. *Cf. Speiser v. Randall*, 357 U.S. 513, 525–26 [78 S.Ct. 1332, 2 L.Ed.2d 1460, 1472 (1958)]. The constitutional protection does not turn upon the "truth, popularity, or social utility of the ideas and beliefs which are offered." *NAACP v. Button*, 371 U.S. 415, 445 [83 S.Ct. 328, 344, 9 L.Ed.2d 405] (1963).

. . . . .

That erroneous statement is inevitable in free debate and that it must be protected if the freedoms of expression are to have the "breathing space" that they "need to survive," (citing case) was also recognized by the Court of Appeals for the District of Columbia Circuit in *Sweeney v. Paterson*, 76 U.S.App.D.C. 23, 24, 128 F.2d 457, 458 (1942), cert. denied 317 U.S. 678 [63 S.Ct. 160, 87 L.Ed. 544] (1942).

See also *Vanesco v. Schwartz*, 401 F.Supp. 87 (D.C.N.Y.1975), aff'd without opinion 423 U.S. 1041, 96 S.Ct. 763, 46 L.Ed.2d 630 (1976). The court in *Vanesco* held that a statute prohibiting "deliberate misrepresentations" and regulations prohibiting "misrepresentations" in political campaigns, which on the face of the statute were not based on a finding of actual malice, was an overbroad infringement upon First Amendment rights and was unconstitutional on its face.

The statute here involved likewise contains no intent requirement, and in fact is even broader since it is not limited to "deliberate" misrepresentation.

Although defendants, as to this particular provision and with so many others, are always proposing the narrowest interpretation possible, and suggesting that this is the way that this, and many other provisions, should be interpreted to save constitutionality of a statute, yet, as has been said, where First Amendment rights are involved, this prohibition in this section of the statute involving as it does a prior restraint on free speech, must be narrowly drawn, and the speaker should not be "chilled" by the potential that some interpretation of his expression concerning which he has no knowledge may make his statement "untruthful." *Gooding v. Wilson*, 405 U.S. 518, 92 S.Ct. 1103, 31 L.Ed. 408 (1972); *Pickering v. Board of Education*, 391 U.S. 563, 573–74, 88 S.Ct. 1731, 20 L.Ed.2d 811 (1968); *Garrison v. Louisiana*, 379 U.S. 64, 85 S.Ct. 209, 13 L.Ed.2d 125 (1964); *NAACP v. Button*, 371 U.S. 415, 433, 83 S.Ct. 328, 9 L.Ed.2d 405 (1963); *Cafeteria Workers Local 302 v. Angelos*, 320 U.S. 293, 295, 64 S.Ct. 126, 88 L.Ed. 58 (1943); *Chaplinsky v. New Hampshire*, 315 U.S. 568, 572, 62 S.Ct. 766, 86 L.Ed. 1031 (1942); *Cantwell v. Connecticut*, 310 U.S. 296, 310, 60 S.Ct. 900, 84 L.Ed. 1213 (1940).

The next questionable part of this section, namely A.R.S. § 23–1385(B)(8), is that which limits consumer picketing by the union solely to situations in which the union has a primary dispute with a particular grower and the picket signs must identify that grower. However, if that particular grower with whom the union has a primary dispute sells to a trade association which utilizes a trade name on the products sold which include the particular grower's product, the union is forbidden in its consumer picketing from referring to that trade name.

Defendants argue that this language is necessary to protect a grower not involved in a dispute with the union who happens to deal in the same product bearing the same trade name, as the grower with whom the union does have a dispute.

However, it must be noted that A.R.S. § 23–1382.6 is the only definition of "dispute," and it is there defined as ". . . any controversy between an agricultural employer and his agricultural employees . . . ." Construing A.R.S. § 1385(B)(8) in light of A.R.S. § 23–1382.6 means that a labor organization is permitted to conduct picketing against a particular employer only if that employer's employees have a controversy over terms and conditions of employment.

In *AFL v. Swing*, 312 U.S. 321, 61 S.Ct. 568, 85 L.Ed. 855 (1941), the Illinois Supreme Court had enjoined picketing by a labor union on the ground that there was no dispute between the employer and his immediate employees. The United States Supreme Court reversed, however, holding that an injunction was inconsistent with "the right to free discussion" and therefore unconstitutional. It follows that if a primary dispute is not required for primary picketing, it cannot be made a requirement for secondary picketing. The same "right to free discussion" is abridged, and it is not outweighed by the State's interest in protecting the secondary employer since the existence of a primary dispute has no relation to whether the secondary employer is being subjected to economic coercion. See also: *Baldwin v. Arizona Flame Restaurant*, 82 Ariz. 385, 313 P.2d 759 (1957), where the Arizona Supreme Court held unconstitutional A.R.S. § 23–1322 which required a "bona fide dispute regarding wages and working conditions" between an employer and a majority of his employees as a prerequisite to lawful picketing. See also: *NLRB v. Fruit Packers Local 760*, 377 U.S. 58, 84 S.Ct. 1063, 12 L.Ed.2d 129 (1964).

This section of A.R.S. § 23–1385(B)(8) therefore is invalid on its face as a violation of the free speech provision of the First Amendment to the Constitution.

## ACCESS BY UNION REPRESENTATIVES

Turning next to a consideration of § 23–1385(C) which in pertinent part reads as follows:

C. . . . No employer shall be required to furnish or make available to a labor organization, and no labor organization shall be required to furnish or make available to an employer, materials, information, *time*, or *facilities* (emphasis added) to enable such employer or labor organization, as the case may be, to communicate with employees of the employer, members of the labor organization, its supporters, or adherents.

This provision clearly states that an employer of migrant farm workers does not have to provide a time or place when and where the union can communicate with his workers, and it also means that the employer does not have to allow the union to come upon his property. The provision provides a positive tool for a grower employer to keep any one and everyone away from his property.

Given the fact, as shown by testimony and other evidence and really not disputed by defendants that the vast majority of farm workers are migratory and generally reside in areas or labor camps located on property owned by the employer, this section must fall because it constitutes an unconstitutional restriction on the First Amendment exercise of free speech because of private property interests.

Even defendants agree that there must be an accommodation between organizational rights and property rights by citing *Central Hardware Co. v. NLRB*, 407 U.S. 539, 92 S.Ct. 2238, 33 L.Ed.2d 122 (1972), but no such accommodation is permitted by this section of the statute.

Beginning with *Marsh v. Alabama*, 326 U.S. 501, 66 S.Ct. 276, 90 L.Ed. 265 (1946), which held that ownership of property didn't always mean absolute domain and that private property was *not* per se immune from a constitutional protection of people on or entering upon property, the courts continued to assert this same principle.

In *Peterson v. Talisman Sugar Co.*, 478 F.2d 73 (5th Cir. 1973), the court found that a labor camp was more analogous to the traditional "company town" than shopping centers discussed in *Amalgamated Food Employees Union v. Logan Valley Plaza*, 391 U.S. 308, 88 S.Ct. 1601, 20 L.Ed.2d 603 (1971); *Hudgens v. NLRB*, 424 U.S. 507, 96 S.Ct. 1029, 47 L.Ed.2d 196 (1976); and *Lloyd Corp. v. Tanner*, 407 U.S. 551, 92 S.Ct. 2219, 33 L.Ed.2d 131 (1971) relied upon by defendants.

In the latter cases, the Supreme Court upheld restrictions on exercise of First Amendment rights because of private property interests.

In the company town situation, pertinent to the facts of this case, the court in *Marsh v. Alabama, supra*, found that there was nothing in the company town, except for mere title in a corporation, which would justify treating it differently from any other municipal center.

The court in *Peterson v. Talisman Sugar Co., supra*, went on to hold that a labor camp was a functional equivalent of a municipality and the company had to accommodate its property rights to the extent necessary to allow the free flow of ideas and information between the union and the migrant workers. See also: *Illinois Migrant Council v. Campbell Soup Co.*, 519 F.2d 391 (7th Cir. 1975); *United Farm Workers Union, AFL–CIO v. Mel Finerman Co.*, 364 F.Supp. 326 (D.Colo.1973); *Franceschina v. Morgan*, 346 F.Supp. 833 (S.D. Ind.1972); *Folgueras v. Hassle*, 331 F.Supp. 615 (W.D.Mich.1971); "First Amendment and the Problems of Access to Migrant Labor Camps After Lloyd Corporation v. Tanner," 61 Cornell L.Rev. 560 (1976).

Defendants argue that this section makes no reference to and does not restrict the rights of employees to communicates with other employees during non-work time in non-work areas, and that the section restricts only labor organizations. They say this section doesn't deny access, it just says that the employer doesn't have to furnish facilities and the union "is not prohibited, in the exercise of free speech, from going into non-work areas on the property at reasonable times for legitimate, peaceful purposes."

However, as to alternative means of communication, A.R.S. § 23–1389(I) provides that an employer need only provide a list of names of the people working for him, and this, taken in conjunction with A.R.S. § 23–1385(C)'s provision which states that no employer shall be required to furnish or make available information to enable a union to communicate with employees, effectively deprives the union of any alternative form of communication due to the migrant nature of the workers.

Defendants also attempt to make a distinction between "furnishing" and "denying access." They seem to argue that these are always two separate acts, one an affirmative and the other negative, and that the Act only applies to one, namely "furnishing." In fact they would appear to be the same activity. If the grower doesn't have to "furnish facilities" that clearly means he doesn't have to provide a time or place when the union can communicate with his workers, and thus also means that he does not have to allow them to come onto his property.

Defendants also seek to distinguish between employee and non-employee union organizers, contending that the former has rights of access while the latter does not. Aside from the dubious value of this distinction in constitutional terms, the words of the statute are not so limited and an employee who is a union organizer is considered under normal agency principles to be an agent of the union, and the employer would not be under any obligation to allow time or facilities for him either.

In brief then, an employer does not have to grant access to facilities which he does not have to furnish.

Given the clearly established rights of communication and organization, this section of A.R.S. § 23–1385(C) is constitutionally defective because it prohibits too broad a scope of activity, both protected and unprotected, involving freedom of association and speech.

## COURT JURISDICTION

We turn finally to A.R.S. § 23–1393(B) which in pertinent part reads:

§ 23–1393. *Court jurisdiction*

. . . . . .

B. In the case of a strike or boycott, or threat of a strike or boycott, against an agricultural employer, the court may grant, and upon proper application shall grant as provided in this section a ten-day restraining order enjoining such a strike or boycott, provided that if an agricultural employer invokes the court's jurisdiction to issue the ten-day restraining order to enjoin a strike as provided by this subsection, said employer must as a condition thereto agree to submit the dispute to binding arbitration as the means of settling the unresolved issues. In the event the parties cannot agree on an arbitrator within two days after the court awards a restraining order, the court shall appoint one to decide the unresolved issues. Any agricultural employer shall be entitled to injunctive relief accorded by Rule 65 of the Arizona Rules of Civil Procedure upon the filing of a verified petition showing that his agricultural employees are unlawfully on strike or are unlawfully conducting a boycott, or are unlawfully threatening to strike or boycott, and that the resulting cessation of work or conduct of a boycott will result in the prevention of production or the loss, spoilage, deterioration, or reduction in grade, quality or marketability of an agricultural commodity or commodities for human consumption in commercial quantities. For the purpose of this subsection, an agricultural commodity or commodities for human consumption with a market value of five thousand dollars or more shall constitute commercial quantities.

This section provides a unique remedy to the employer. On his verified petition to the Court, alleging that his employees are unlawfully on strike and alleging a prevention of production or loss or spoilage of his crop, several things happen:

1. As a condition for the order he, the employer, must "agree" to submit the issues to binding arbitration;

2. If the parties within two days after the issuance of the order cannot agree upon an arbitrator to decide the issues, the Court *"shall"* appoint one "to decide the unresolved issues."

The effect of the section is apparent, if the union should insist under the "employees' rights" section (A.R.S. § 23–1383) that they have a right to bargain concerning an issue which is contrary to that of the employer's position under the "management rights" sections (A.R.S. §§ 23–1384, 23–1385(B)(11), 23–1385(D)), then any resultant strike by the union in support of their position can be unilaterally deemed "unlawful" by the employer who can, without the consent of the union, submit the dispute to binding arbitration by an outsider. The act then mandates the Court to submit the matter to a stranger and deprives the Court of further jurisdiction to hear the matter on its merits.

Such unilateral compulsory arbitration constitutes a clear denial of due process under the law for when the effect of statutes has been to coerce parties to submit to arbitration, without agreement or assent on their part to do so, the courts have declared them unconstitutional [*Dorchy v. Kansas*, 264 U.S. 286, 44 S.Ct. 323, 68 L.Ed. 686 (1924); *Chas. Wolff Packing Co. v. Court of Industrial Relations*, 262 U.S. 522, 43 S.Ct. 630, 67 L.Ed. 1103 (1923); *Graves v. Northern P. R. Co.*, 5 Mont. 556, 6 P. 16 (1885)] as depriving parties of liberty and property without due process of law, 55 A.L.R.2d 445, 510, or as depriving parties of constitutional right to a trial by jury. *Re Smith*, 381 Pa. 223, 112 A.2d 625, app. dismissed, 350 U.S. 858, 76 S.Ct. 105, 100 L.Ed. 762 (1955).

Furthermore, under Arizona law pertaining to arbitration which contains procedures for arbitration and means of review, § 12–1517 makes such article to have ". . . no application to arbitration agreements between employers and employees or their respective representatives."

We therefore strike down this section of the statute, A.R.S. § 23–1393(B), as unconstitutional in violation of the due process clause of the Fourteenth Amendment to the Constitution and the Seventh Amendment providing for right to trial by jury.

## CONCLUSION

To conclude, we find that the fatal flaw in the Arizona Agricultural Employment Relations Act consists of the inability of agricultural employees to organize in the first instance to exercise their right of freedom of speech and assembly, as we indicated in striking down A.R.S. § 23–1389.

This, coupled with the other sections struck down, results in a complete perversion of the expressed intent of the Legislature to allow agricultural employees to "be free to organize, take concerted action and, through representatives of their own choosing, enter into collective bargaining agreements establishing their wages and terms and conditions of employment. . . ."

The limitation on this right to organize is frustrated by legislated delay, the inability to communicate with employees at the employer's facilities, the unlawful proscription on free speech, the right to concerted action in the form of a lawful strike clearly threatened by the employer's unilateral action in having the issue determined by a stranger through compulsory arbitration which in turn takes away the right to a trial by jury, and finally by the imposition of vague and ambiguous criminal sanctions. In the light of these rulings there is obviously no need to rule on plaintiffs' other contentions including the claimed equal protection violation.

In light of the findings of this Court,

IT IS ORDERED that a permanent injunction shall issue enjoining defendants from applying or enforcing any of the provisions of A.R.S. § 23–1381, et seq.

## JUDGMENT

The Court having found that the Agricultural Employment Relations Act, A.R.S. § 23–1381, et sequence, is unconstitutional in its entirety for the reason that A.R.S. §§ 23–1385(B)(8), 23–1392, 23–1393(B) are unconstitutional and void on their face, and A.R.S. §§ 23–1385(C) and 23–1389 are likewise unconstitutional when considered in

context with the testimony and other evidence presented, and these sections having been found to be in violation of the First and Fourteenth Amendments to the Constitution of the United States and in violation of the freedom of speech and assembly provisions and of the due process and equal protection clauses with A.R.S. § 23–1393(B) also found to be in violation of the Seventh Amendment providing for right to trial by jury and with the rest of the Act falling by reason of its inseparability and inoperability apart from the provisions found to be invalid,

IT IS THEREFORE ORDERED that judgment is hereby rendered in favor of plaintiffs herein in accordance with the opinion of the Court and a permanent injunction is hereby entered preventing enforcement by defendants herein of A.R.S. §§ 23–1381, et seq.

CRAIG, District Judge, concurring:

In this case I would have preferred to invoke the doctrine of abstention in order that the Supreme Court of Arizona might first express its opinion with respect to the constitutionality of a law established by the Arizona State Legislature. The majority has elected to consider the case on its merits.

I, therefore, concur in the result, although I would have used fewer words to reach it.