Angelo **FRANCESCHINA** et al., Plaintiffs,

v.

Ivan H. **MORGAN** et al., Defendants.

David **CORMIER** et al., Plaintiffs,

v.

Ivan H. **MORGAN** et al., Defendants.

Nos. NA 72–C–32, NA 72–C–37.

United States District Court,
S. D. Indiana,
New Albany Division.

Aug. 14, 1972.

Louis F. Rosenberg, Indiana Civil Liberties Union, Indianapolis, Ind., Vincent J. Carroll, Migrant Legal Action Program, Inc., Washington, D. C., for plaintiffs.

James E. Bourne, Orbison, Rudy & O'Connor, New Albany, Ind., Geoffrey Segar, Ice, Miller, Donadio & Ryan, Indianapolis, Ind., Robert B. Railing, Scottsburg, Ind., for defendants.

## MEMORANDUM OF DECISION

DILLIN, District Judge.

Defendants in the above actions, consolidated for trial, allegedly denied or restricted plaintiffs' access to certain migrant farm labor camps owned by one of the defendants, when plaintiffs sought to enter for the purpose of furnishing advice, information, and services to the migrants. Plaintiffs sought injunctive relief. The consolidated actions came on for hearing on July 31, 1972, on plaintiffs' motions for a temporary injunction. On August 1, 1972, at the conclusion of the evidence, which was undisputed, all parties agreed that the Court could consider the actions as submitted on the merits as to the ultimate relief sought by plaintiffs, i. e., permanent injunctions, for the reason that the issues presented were essentially issues of law. The Court thereupon entered a permanent injunction against certain of the defendants, pursuant to partial findings of fact and conclusions of law expressed orally from the bench. This memorandum amplifies such findings and conclusions, *nunc pro tunc*, in accordance with Rule 52(a), F.R.Civ.P.

## FACTS

The defendant Morgan Packing Company, Inc., (hereafter "the company") is an Indiana corporation having its principal place of business in Scott County, Indiana. It is a major grower-processor of vegetables, growing part of its crops on its own land, and also purchasing vegetables from independent farmers in the various areas within which it does business. As an incident of its operations it has seasonally employed migrant farm laborers for the past 12 years, both as field workers and cannery workers, most of whom are Mexican-Americans who are citizens of the United States, having a permanent address in Texas. Twenty-five percent of these workers speak no English, and many others speak English only on a limited basis.

Most of the migrants, especially the field workers, are given temporary housing by the company during the period of their employment in various agricultural labor camps located on company property in seven Indiana counties. There are three of such camps near Austin, in Scott County, and others near Brownstown, Converse, Fountaintown, Franklin, Red Key, and Warren, Indiana. The company is required by Indiana law to

obtain an annual permit to operate such camps from the State Board of Health; said Board is required to and does publish rules and regulations governing the operation of such camps from the standpoint of health, sanitation, fire protection, and related subjects. Burns' Ind. Stat.Ann. § 15–2601, et seq., (1971 Cum.Supp.), IC 1971, 15–3–2–1.

From time to time the company has used the interstate facilities of the United States Employment Service in filling its requirements for migrant workers (several hundred per season), pursuant to the Wagner-Peyser Act of 1933,[1] and the regulations[2] promulgated by the Secretary of Labor pursuant to that Act.

It is to be noted, however, that none of the field workers may be said to be directly employed by the company. The company contracts with various so-called crew leaders for a certain number of laborers, and it then becomes the responsibility of the crew leader to recruit and deliver them. The company does not pay any wages directly to the laborers, but rather pays to the crew leader, in cash, the total sum credited to his crew for a given period of time. Many of the migrants who occupy the company's camps do not work in the company's fields at all, but harvest crops for independent farmers, who in turn pay their wages to their crew leaders. Some work alternately for the company and for independent farmers, as work becomes available.

Although theoretically free to travel about when not at work, most migrants spend their leisure time in camp. The language barrier, lack of transportation, lack of surplus funds for tourism, and the desire to try to save a little money for the winter all contribute to this result. They are reluctant to discuss matters with persons represented by plaintiffs in such places as public stores and shopping centers, assuming that they ever travel to such, because their Spanish language dialogues draw unwanted attention from the natives. As a practical matter, therefore, their best assurance of contact with the outside world is by means of visits to their camp by persons such as plaintiffs.

Typical of the camps are the three near Austin. Located in close proximity to each other on alternate sides of Christie Road, a public highway, they consist of groupings of one and two room houses and barracks-type buildings, with toilets, showers, lavatories, and laundry facilities being separately located in buildings used in common for such purposes. The buildings have electricity, and those intended for family occupancy include a gas range and a refrigerator. Tables and cots are also furnished. There are graveled drives leading into each compound from the public highway, with additional drives and parking areas within the compound proper. At the entrance to each compound is a sign bearing the legend "Posted—Private Property— Keep Out." The camps are located approximately one mile from the nearest grocery store, which is also owned by the company. Some of the migrants own their own automobiles, while others do not. The company has from time to time, but not on a scheduled basis, furnished bus transportation to the migrants for the purpose of attending church services in Austin, and also furnishes bus transportation for migrant children who attend the Austin school.

For a number of years, the company made no effort to enforce its "no trespassing" rule. Persons wishing to visit the migrants were free to do so, and many did, including ministers, church workers, hucksters, and representatives of corporations and unincorporated associations organized for the specific purpose of attempting to better the lot of the migrants.

The plaintiff Associated Migrant Opportunity Services, Inc., (hereafter "AMOS") an Indiana nonprofit corporation, is such a corporation, funded by

---

1. Act of June 6, 1933, c. 49, 48 Stat. 113, 29 U.S.C. § 49, et seq.

2. 20 CFR § 602.1, et seq.

the Office of Economic Opportunity (hereafter "OEO") to provide, *inter alia*, information, services and benefits to migrant and seasonal workers in the State of Indiana, pursuant to 42 U.S.C. §§ 2861, 2862. Plaintiffs Franceschina and Munguia are AMOS employees, and such three plaintiffs are members of a representative class, to wit: federal, state, local or private funded agencies and those persons employed by them or who perform volunteer services for them, which agencies are mandated to provide to farm workers information about and assistance · in obtaining the benefits of both private and public programs and agencies aimed at assisting farm workers.

Another OEO funded nonprofit corporation active in the Austin area is Ohio Valley Opportunities, Inc., (hereafter "OVO") which includes as a part of its mission the alleviation of poverty in a certain area of Indiana, including Scott County, and is interested in family planning, "head start" programs, and the like. During the period beginning in 1967 and ending in October, 1971, its executive director was one Judith Anderson. She and others of her organization went routinely in and out of the Austin camps on various humanitarian missions, until halted as hereafter described.

In June, 1971, the plaintiff Franceschina arrived in Austin as an employee of OVO. He was discharged after approximately three weeks, at the demand of the defendant Ivan H. Morgan, president of the company. He remained in the area as an OVO volunteer and in late July or early August accompanied the plaintiffs Cormier, Cardenas, and Landeros to the Austin camps, as a guide. Such plaintiffs are members of an unincorporated association called the Farm Labor Aid Committee (hereafter "FLAC"), whose organizational purpose is to inform farm workers of their right to organize for the purpose of collective bargaining, the benefits of organization, and to distribute literature on organizing. Such plaintiffs are members and

representatives of a class, to wit: private individuals who seek to provide assistance and information to farm workers about the advantages of organization and collective bargaining.

Said plaintiffs in fact distributed literature, consisting of a copy of the constitution of the union United Farm Workers, AFL–CIO, and a pamphlet setting out arguments in favor of unionization, both printed in the Spanish language. When this came to the attention of Morgan, he forthwith took action, in conjunction with the defendant Hoard, the company's agent in charge of the Austin camps, one Fraley, the company's agent in charge of the Converse camp, and various others, including guards hired by the company, to prevent any persons, and particularly those of the classes represented in the within causes, from entering the various camp areas for the purpose of talking to or assisting the migrants, or to permit access only upon certain conditions.

Specifically, Franceschina was forbidden access under any circumstances, on the grounds, *inter alia*, that he was long haired, liberal, a socialist, and that he had participated in passing out the FLAC pamphlets. All persons known or suspected to be members of or friendly to FLAC were forbidden all access. Anderson was forbidden access for the purpose of organizing a day care center for migrant children on the ground that she was too friendly with Franceschina and that "migrants don't need education—if they are educated they won't work." Morgan threatened to have her discharged from her OVO job, and she was in fact discharged in a short time. During the course of this particular tirade, Morgan also boasted that he and the company dominated the local legal structure. Employees of AMOS and OVO were, after August, 1971, either denied access to the camps or were permitted to enter only after being kept waiting, being required to sign a log book, and being accompanied by a company guard to monitor conversations with migrants. A newspaper reporter was only permit-

ted access under the same conditions, and after a warning that it would be "bad" for the paper if it "got involved" in the unionization activities. Finally, on August 24, 1971, the plaintiff Munguia was arrested by a deputy of the defendant Hardy, the Sheriff of Scott County, on a warrant issued by a local justice of the peace pursuant to an affidavit charging trespass, in violation of Burns' Ind.Stat.Ann. § 10–4506 (1971 Cum.Supp.), IC 1971, 35–1–64–1.[3] The affidavit was executed by the defendant Hoard who, in addition to his duties as an agent for the company, was an "Honorary Deputy Sheriff" on the staff of Hardy.[4] It charged Munguia with unlawfully entering camp #3 "after being ordered to depart by Karlyn C. Hoard, agent for I. H. Morgan." At the time of this incident, Munguia was an employee of AMOS.

## JURISDICTION

The Court finds that it has jurisdiction of the actions by virtue of Title 28 U.S.C. § 1343(3), (4), as implementing provisions of the Constitution, particularly Amendments I and XIV, and civil rights legislation codified as 42 U.S.C. §§ 1981, 1982, 1983, 1985(3), 18 U.S.C. § 245, and the civil actions and remedies implied therefrom. The Court also finds that it has pendent jurisdiction with respect to claims arising under the Indiana constitution and laws pertaining to citizens' and tenants' rights.

## DISCUSSION

■ There can be no doubt that the communications sought to be protected in these actions are covered by the First Amendment, and protected against state action by the Fourteenth. NAACP v. Button, 371 U.S. 415, 83 S.Ct. 328, 9 L. Ed.2d 405 (1963); NAACP v. Alabama, 357 U.S. 449, 78 S.Ct. 1163, 2 L.Ed.2d 1488 (1958); Martin v. Struthers, 319 U.S. 141, 63 S.Ct. 862, 87 L.Ed. 1313 (1943), including communications concerning labor problems and union organization. Thomas v. Collins, 323 U.S. 516, 65 S.Ct. 315, 89 L.Ed. 430 (1945); Hague v. CIO, 307 U.S. 496, 59 S.Ct. 954, 83 L.Ed. 1423 (1939).

■■ In the cases at hand, we find a company, licensed by the state to operate agricultural camps, inducing migrants to occupy the camps and then denying access to the migrants under color of a state trespass law, enforcing such action by causing criminal prosecutions to be instituted against persons who attempt, nevertheless, to exercise their First Amendment rights to speak and distribute literature to the migrants. This clearly violates the First and Fourteenth Amendments, Marsh v. Alabama, 326 U.S. 501, 508, 66 S.Ct. 276, 90 L.Ed. 265 (1946), and thus brings the cases within the jurisdictional ambit of 28 U. S.C. § 1343(3) and 42 U.S.C. § 1983. Just as clearly, the concerted actions of the defendants Morgan and Hoard, together with those of Fraley, and the

3. Section 10–4506 reads, in pertinent part, as follows: "Whoever, being about to enter upon the inclosed or uninclosed land . . . of another, shall be forbidden so to do by the owner, . . . or his agent . . . or who, being upon the inclosed or uninclosed land . . . of another, shall be notified to depart therefrom by the owner, . . . or his agent . . . and shall thereafter at any time enter upon such land . . . or neglect to refuse to depart therefrom at any time, or whoever wilfully or without right enters any . . . farm premises or farm land, or any fenced inclosed or uninclosed land, tract or area of another, when a printed or written notice forbidding or

prohibiting trespass in general or in any detail has been conspicuously posted or exhibited at the main entrance to such . . . farm premises, farm land, or fenced inclosed or uninclosed land, tract or area, shall be guilty of a misdemeanor, and, on conviction, shall be fined not less than twenty-five dollars [$25.00] nor more than five hundred dollars [$500] to which may be added imprisonment for not more than six [6] months."

4. Hoard also, on occasion, displayed a deputy sheriff's badge given to him by Hardy to lend emphasis to his orders to various persons not to enter the Austin camp.

various company guards, confer jurisdiction pursuant to 28 U.S.C. § 1343(4) and 42 U.S.C. § 1985(3), whether or not "color of state law" is found to exist. Griffin v. Breckenridge, 403 U.S. 88, 91 S.Ct. 1790, 29 L.Ed.2d 338 (1971); Folgueras v. Hassle, 331 F.Supp. 615 (W. D.Mich.1971).

In support of their position, plaintiffs have cited Marsh v. Alabama, *supra*, and Amalgamated Food Employees Union Local 590 v. Logan Valley Plaza, 391 U.S. 308, 88 S.Ct. 1601, 20 L.Ed.2d 603 (1968). Defendants, on the other hand, argue that the vitality of both of these cases has been sapped by the decisions of June 22, 1972, in Central Hardware Co. v. NLRB, 407 U.S. 539, 92 S.Ct. 2238, 33 L.Ed.2d 122, and Lloyd Corp. v. Tanner, 407 U.S. 551, 92 S.Ct. 2219, 33 L.Ed.2d 131. This Court does not believe that any of the four cases has specific application to the cases here submitted. *Marsh,* of course, held that an Alabama trespass statute, similar to the Indiana statute here involved, could not constitutionally be applied so as to justify prosecution of a person distributing religious writings on the privately owned streets of a company town. *Logan Valley* held a similar Pennsylvania statute inapplicable to peaceful picketing by a labor organization against a specific market located within the confines of a privately owned shopping center. *Lloyd Corporation,* on the other hand, set aside a lower court injunction restraining petitioner from interfering with the distribution of handbills on its shopping center property, on the basis that it had a right to enforce its rule against handbills in a nondiscriminatory manner. *Central Hardware* reversed a decision holding that union organizers had a right to solicit in petitioner's parking lot, on the basis that the case was not controlled by *Logan Valley,* but by NLRB v. Babcock & Wilcox Co., 351 U.S. 105, 76 S. Ct. 679, 109 L.Ed. 975 (1956), a case interpreting § 7 of the National Labor Relations Act.

■ In *Marsh, Logan Valley,* and *Lloyd Corporation* there is much discussion as to the public or quasi-public nature of streets and sidewalks in company towns and shopping centers. In the present cases, however, the Court believes that it begs the real issue to attempt comparison of company camps to company towns, or to attempt to determine, as in *Lloyd Corporation,* whether exclusionary rules are applied in a nondiscriminatory manner. The real question is whether or not the owner of land may lawfully prescribe who may talk to his tenants, and monitor any conversations which may be permitted. The question supplies the answer, which must be in the negative.

■ Likewise, it matters not whether the status of the migrants vis-a-vis the company be characterized as that of tenants, as maintained by plaintiffs, or as servants, as argued by defendants. In this connection, however, it is difficult to understand how they could be classified as servants of the company since, as above noted, many of them do not even work for the company and none are paid directly by it. The offer of free rent, which is expressly held out in the company's United States Employment Service applications, is undoubtedly a consideration which helps to induce the migrant to come to Scott County and the other Indiana communities in which the company furnishes housing. By accepting the offer, the migrant swells the pool of agricultural labor in the area, which is to the company's advantage in that it tends to guarantee the flow of crops to its canneries. This is consideration enough, it seems to the Court, to denote the migrant a tenant for the term of the crop season. A tenant *sui generis*, perhaps, but yet a tenant.

In short, the controlling status here is that the migrants are citizens of the United States, residing in their own homes, and are entitled to be treated as such. By the same token, their would-be visitors have the constitution-

al right to visit with them, subject to the discretion of the migrants and not of the company, its employees, and political auxiliary. Cf. *Martin v. Struthers, supra*; *Lovell v. Griffin*, 303 U.S. 444, 58 S.Ct. 666, 82 L.Ed. 949 (1938).

 As was said by the Attorney General of Michigan, quoted in *Folgueras*, ". . . The freedoms of religion, speech, press and assembly guaranteed by the First and Fourteenth Amendments to the United States Constitution are operative throughout the length and breadth of the land. They do not become suspended on the threshold of an agricultural labor camp. The camp is not a private island or an enclave existing without the full breadth and vitality of federal constitutional and statutory protection." Attorney General Opinion # 4727, filed April 13, 1971.

Put another way, the company has voluntarily elected to furnish temporary homes to migrants as an aid to its business. It can no more deny access to those homes to persons going to offer sorely needed assistance[5] to the migrants, than it can enter them, search them, or quarter troops in them during the period of their lawful occupancy. All other courts which have been confronted with the problem have come to the same conclusion, by one avenue or another. NLRB v. Lake Superior Lumber Corp., 167 F.2d 147 (6 Cir. 1948); Folgueras v. Hassle, *supra*; State v. Shack, 58 N.J. 297, 277 A.2d 369 (1971); People v. Rewald, 65 Misc. 2d 453, 318 N.Y.S.2d 40 (1971); Henningsen v. Bloomfield Motors, Inc., 32 N.J. 358, 161 A.2d 69 (1960). See also Gomez v. Florida State Employment Service, 417 F.2d 569 (5 Cir. 1969).

The Court therefore concludes that the law is with the plaintiffs in both cases, and that a permanent injunction should issue, enjoining the defendants Morgan Packing Company, Inc., Ivan H. Morgan, Karlyn Hoard, their agents, employees and successors, from delaying, hindering, or interfering in any way with the ingress and egress of plaintiffs and all others similarly situated to and from the agricultural labor camps of the defendant company, and from limiting or interfering with their oral or written communications to the residents of such camps.

---

5. See, The Migratory Farm Labor Problem in the United States, United States Senate Report No. 91–83 (1969).