**HICKORY FIRE FIGHTERS ASSOCIATION, LOCAL 2653 OF the INTERNATIONAL ASSOCIATION OF FIRE FIGHTERS; Thomas R. Mull; David A. Love; Charles W. Hill; Ernest F. Eckard; Harold Suddreth; Boyd Townsend; Stewart Travis; Boyd L. Lynn; Wilbur Hobby; John Doran; and William Brawley, Appellants,**

v.

**The CITY OF HICKORY, NORTH CAROLINA; Wilfred Wells; George D. Murphy; Everett M. Eckard; John N. Grubbs; Glen C. Hilton; Phillip C. Young; Edgar E. Rhyne; Neil W. Clark; and Larson H. Moore, Appellees.**

No. 80–1577.

United States Court of Appeals,
Fourth Circuit.

Argued Feb. 3, 1981.

Decided Aug. 3, 1981.

---

Shelley Blum, Raleigh, N. C., North Carolina Labor Law Center, for appellants.

Ronald E. Bogle, Hickory, N. C. (E. Murray Tate, Jr., Tate, Young & Morphis, Hickory, N. C., on brief), for appellees.

Before HAYNSWORTH, Chief Judge, and SPROUSE and ERVIN, Circuit Judges.

ERVIN, Circuit Judge:

This case presents several issues concerning the First Amendment rights of a firefighters' association and of certain individuals. The Hickory Fire Fighters Association (the Association) and various individuals filed suit under 42 U.S.C. § 1983 against the City of Hickory, North Carolina, seeking damages and declaratory and injunctive relief. They allege (1) that the restrictions imposed by the city council on speech by representatives of the Association denied and continue to deny the Association and its representatives equal protection of the laws in exercising their First Amendment rights; (2) that the local picketing ordinance unconstitutionally limits the exercise of First Amendment freedoms; (3) that the fire chief's statement that officers who picketed would be dismissed violated and continues to violate the officers' First Amendment rights; and (4) that the removal of the Association's charter from the station wall violated the Association's right of free speech. The district court granted summary judgment to the City on all four claims. We reverse and remand.

I.

The Association is composed of a majority of the firefighters employed by the City of Hickory. Concerned about the local firefighters' wages, various representatives of the Association attempted upon three occasions in 1978 and 1979 to speak to the Hickory City Council during its regular sessions. Those incidents form the basis of the claim that the city council has denied the Association and its representatives equal protection of the laws in exercising the right to free speech.

The first incident occurred on November 17, 1978, when Tom Mull, a party to this action and then president of the Association, called City Manager Wilfred Wells to request that he be placed on the agenda for the next council meeting. Wells' secretary immediately placed Mull on the agenda but called him back five minutes later to report that Wells would not allow him to speak.

The second incident took place on June 19, 1979. At its meeting on that date, the council recognized Lieutenant Charles Hill, a member of the Association and a party to this law suit. After Hill began to speak, the council ruled him out of order. Hill alleges that he was silenced because he was

talking as a representative of the Association about firefighters' conditions of employment, while the City alleges that he was ruled out of order because he was intoxicated.

The final incident took place between August 3 and August 7, 1979. On August 3, Mull wrote to City Manager Wells on the Association's letterhead, requesting that Mary Ellen Oyler, Shelley Blum, Charles Kossuth, John Doran, and William Brawley be allowed to speak. Wells refused to allow them to speak to the council as representatives of the Association but stated that he would allow any of them to speak as individuals, if they made individual requests. Only Oyler did so, and she was allowed to speak at the August 7 meeting. Wells publicly commented on this last incident, stating that "[w]hen a municipality receives a request on union stationery that union persons wish to speak on a union matter, it does not have a place on the agenda."

We have recently held in *Henrico Professional Firefighters Association, Local 1568 v. Board of Supervisors*, 649 F.2d 237 (4th Cir. 1981), that a governing body that regularly allows public comment by individuals and representatives of associations may not deny a representative of a public employees association the opportunity to be heard on employment matters, absent compelling justification. Such discrimination without a compelling interest on the part of the government offends the Constitution under both First Amendment and equal protection analyses. *Id.*, at 241. Thus, if the Hickory City Council opens the floor to the public, it may not prohibit speech by the Association's representatives concerning employ-

ment conditions, without a substantial governmental interest.[1]

Assuming for purposes of this analysis that portions of the city council meetings are dedicated as public forums, we review the City's justifications for the restrictions it has placed, and wishes to continue to place, on speech made on behalf of the Association.

■ The City's first argument is that, because a public employee's First Amendment rights may be more severely restricted than those of a private citizen, a compelling governmental interest in efficiency allows the restriction of speech by the Association's representatives. That argument fails to persuade us. As we acknowledged in *Henrico*, a "public employer may have interests in regulating the speech of its employees that differ from its interests in regulation of speech of the citizenry at large," *id.* at 243, and it may limit the speech of public employees if its legitimate interest in promoting the efficiency of the public services performed by the employees outweighs the interest of the employees, as private citizens, in commenting upon matters of public concern. *See Pickering v. Board of Education*, 391 U.S. 563, 88 S.Ct. 1731, 20 L.Ed.2d 811 (1968). There is lacking in this case, however, as there was in *Henrico*, any indication that allowing those representatives of the Association who are public employees to speak at a city council meeting would undermine the efficiency of the fire department. On the other hand, the working conditions of the firefighters are a matter of public concern which the Association's representatives are especially

1. In *Henrico*, we specifically declined to address the question whether a governmental rule forbidding speech by representatives of all associations, corporations, and organizations and allowing only individuals to speak would be unconstitutional, because that case involved a governing body that regularly opened its meetings to speech by both individuals and representatives of associations. We similarly conclude that the question need not be addressed in this case, as the record does not show that the Hickory City Council has forbidden speech by representatives of all associations and groups, and as the City does not argue that

such a policy is, or should be, in effect. For purposes of this opinion, then, we assume that the Hickory City Council has not adopted that policy. We note that, at any rate, a rule of that kind would be of dubious constitutionality, in light of the Supreme Court's decision in *First National Bank of Boston v. Bellotti*, 435 U.S. 765, 98 S.Ct. 1407, 55 L.Ed.2d 707 (1978) (state criminal statute forbidding certain expenditures by banks and business corporations for purpose of influencing vote on referendum proposals abridged protected speech, and protection was not lost simply because of the corporate identity of the speaker).

well qualified to address. The balancing of interests required by *Pickering* thus results in a strong tilt toward allowing the speech in question, even though the speakers are public employees.

■ The City also asserts as a compelling state interest public policy considerations. It argues that the speech in question is actually labor negotiation and that North Carolina law forbids the city council to bargain with unions of public employees. *See* N.C.Gen.Stat. § 95–98 (1981).[2] The flaw in this argument is that it equates advocacy of the Association's views on firefighters' wages with negotiation. *See Henrico*, at 244. The two processes are, in fact, quite distinct. " 'Representation' in the labor context means, of course, something more extensive, more exclusive and more enduring than the simple 'representation' involved in standing up to speak on another's behalf." *Id.* at 244.[3] Although N.C.Gen. Stat. § 95–98 forbids North Carolina municipalities from entering into contracts or agreements with labor unions or associations, that prohibition does not extend to a union's advocacy of a particular point of view. Thus, North Carolina's policy prohibiting governmental bodies from negotiating with labor unions is not implicated in this case and therefore cannot serve as a compelling state interest allowing restriction of the Association's right to advocate its position on firefighters' wages in front of the city council.

■ The City's third rationale for prohibiting speech by the Association's representatives—that, because the firefighters have access to an established grievance procedure for complaints about their employment, the city council's time should not be taken up with public employment matters—also fails to rise to the level of a compelling governmental interest. First, we note that the grievance procedure serves a different purpose from that of speech by the Association before the city council: the grievance procedure is designed to address and resolve individual complaints, while the speech before the council commands an audience and presents collective concerns of the firefighters, without requiring that those concerns be addressed or resolved. *See Henrico*, at 244–245. Even if the grievance procedure served essentially the same purpose as speech before the council, however, the city council could not justify limiting the speech on that ground. " [O]ne is not to have the exercise of his liberty of expression in appropriate places abridged on the plea that it may be exercised in some other place.' " *Edwards v. Maryland State Fair and Agricultural Society, Inc.*, 628 F.2d 282, 286 (4th Cir. 1980) (quoting *Schneider v. State*, 308 U.S. 147, 163, 60 S.Ct. 146, 151, 84 L.Ed.2d 155 (1939)).

The City having failed to advance a compelling governmental justification for limiting speech by the Association at city council meetings, the city council must, whenever it conducts its meetings as open forums, allow representatives of the Association an opportunity to air the Association's views on firefighters' employment concerns. *See Henrico; National Socialist White People's Party v. Ringers*, 473 F.2d 1010 (4th Cir. 1973) (en banc) (school board that rented high school auditorium to outside individuals and groups and thereby partially dedicated it as a public forum could not deny political party use of the facility on the basis of that party's discriminatory membership policy).

---

2. N.C.Gen.Stat. § 95–98 reads in pertinent part:

Any agreement, or contract, between the governing authority of any city, town, county, or other municipality, or between any agency, unit, or instrumentality thereof ... and any labor union, trade union, or labor organization, as bargaining agent for any public employees of such city, town, county or other municipality, or agency or instrumentality of government, is hereby declared to be against the public policy of the State, illegal, unlawful, void and of no effect.

3. The city's reliance on *Smith v. Arkansas State Highway Employees, Local 1315*, 441 U.S. 463, 99 S.Ct. 1826, 60 L.Ed.2d 360 (1979) is misplaced. While the Court in that case held that a state governing body's refusal to bargain with a public employees' union did not offend the First Amendment, it distinguished labor negotiation from advocacy by unions and affirmed the First Amendment right of unions to advocate the views of its members. *See Henrico*, at 243–245.

We now turn to our analysis of the public forum aspect of the case. The public forum concept does not require that city council meetings always be open. In order to conduct its business, the council may impose reasonable time, place, and manner restrictions on speech. *See, e. g., City of Madison, Joint School District No. 8 v. Wisconsin Employment Relations Commission*, 429 U.S. 167, 97 S.Ct. 421, 50 L.Ed.2d 376 (1976) (concurring opinions). What it cannot do, however, is open a meeting to the public and then prohibit the Association's speech simply because of what the Association is or what its representatives wish to say. As we summarized the application of the open forum doctrine in this context in *Henrico*:

> It is sufficient merely to say that once a meeting has been generally opened to presentation by the public, First and Fourteenth Amendment protection does extend to an association whose exclusion from speaking is predicated solely on the basis of its status as an organization of employees. Thus we reject the view that because a governmental body may sometimes close its doors entirely to the public or limit discussion to certain subjects only, it may deny access to an association when it welcomes any individual to speak, and allows representatives of groups other than public employees to be freely heard. At 246.[4]

■ The facts established by the record in this case lead us to conclude that the summary judgment entered on this aspect of the claim must be reversed and the matter remanded because of the existence of genuine issues of material fact, i. e., whether the city council meetings on the three occasions in issue were conducted at least in part as open forums and whether council meetings continue to be so conducted. If they were so conducted on the critical dates, then the city council's refusal to allow Mull to speak in November 1978 and its refusal to allow individuals to speak as representatives of the Association in August 1979 would be unconstitutional infringements of First Amendment rights. The incident involving Hill presents the additional factual question whether Hill was silenced because of the content of his speech or because he had been drinking excessively. If Hill was not allowed to speak in a public forum because of what he was saying, the city council's action would have also violated his First Amendment rights. Finally, if the district court determines that city council meetings are presently dedicated as public forums at certain times, then appropriate injunctive relief consistent with the views expressed in this opinion is in order.

## II.

■ The Association also voiced concern about firefighters' wages and working conditions by staging demonstrations around the city hall in Hickory on August 6 and 7, 1979. The Association alleges that the local police ordered demonstrators to comply with the local picketing ordinance, Hickory, N. C., Code § 22–18 (1977), and threatened arrest for noncompliance. The Association argues that the picketing ordinance is unconstitutionally burdensome, and it seeks declaratory and injunctive relief. The City, on the other hand, asserts that the ordinance is a reasonable exercise of its police power. The district court granted summary judgment in favor of the City on this claim.[5]

---

4. Both parties devote discussion to the city council rules of procedure, adopted on November 20, 1979, as a codification of past policy. We do not find it necessary to review the precise language of these rules but note that to the extent that they are inconsistent with this opinion, they unlawfully infringe on constitutionally protected rights.

5. The City seeks to protect the summary judgment in its favor by raising the additional argument that the Association and individual plaintiffs do not have standing to assert the unconstitutionality of the picketing ordinance, in that no one was arrested, disciplined, reprimanded, or terminated for picketing activities. The proper test for standing in this context, however, is not whether a plaintiff has been arrested or otherwise punished for exercising First Amendment rights in violation of the ordinance, but whether the plaintiff faces "realistic danger of sustaining a direct injury as a result of the statute's operation or enforcement." *Babbitt v. United Farm Workers*, 442 U.S. 289, 298, 99 S.Ct. 2301, 2308, 60 L.Ed.2d 895 (1979).

Hickory, N.C., Code § 22–18 reads in relevant part:

Peaceful picketing, including demonstrating, in the furtherance of a lawful purpose shall be permitted in the city; provided, that the same is done under the following conditions:

(a) Picketing shall be conducted only on the sidewalks or other city owned area normally used or reserved for pedestrian movement, including easements and rights-of-way, and shall not be conducted on the portion of a street used primarily for vehicular traffic.

(b) Not more than ten pickets promoting the same objective shall be permitted to use the sidewalk within one block in the city at any one time.

(c) Such pickets may carry written or printed placards or signs not exceeding two feet in width and two feet in height promoting the objective for which the picketing is done; provided, that the words used are not defamatory in nature or would tend to produce violence. The staff on which such placard is carried shall not exceed forty inches in length, must be made of wood, shall not exceed three-fourths of an inch in diameter at any point and must be blunt at each end.

(d) Pickets must march in single file and not abreast and may not march closer together than fifteen feet, except in passing one another.

The presumption of constitutionality usually accorded legislative decisions does not apply to our review of the ordinance in this case. *See Blasecki v. City of Durham*, 456 F.2d 87, 91 (4th Cir.), *cert. denied*, 409 U.S.

912, 93 S.Ct. 224, 34 L.Ed.2d 172 (1972). Because we find ourselves in the sensitive realm of First Amendment rights,[6] we must instead inquire whether the City has compelling governmental interests unrelated to speech which justify time, place, and manner regulations on picketing by ordinance and, if so, whether the ordinance's requirements are drawn with narrow specificity and are no more restrictive than necessary to serve those interests. *See Grayned v. City of Rockford*, 408 U.S. 104, 92 S.Ct. 2294, 33 L.Ed.2d 222 (1972).

We have no difficulty finding that Hickory has met the requirement that it have compelling interests warranting some restriction of picketing activity. The City's interests in protecting the safety and welfare of its citizens, including preservation of access to its public buildings and maintenance of vehicular and pedestrian traffic flow, are sufficiently compelling to warrant restricting the exercise of First Amendment rights by a picketing ordinance. *See Grayned v. City of Rockford*, 408 U.S. at 115–17, 92 S.Ct. at 2302–2304; *Shuttlesworth v. Birmingham*, 394 U.S. 147, 152, 89 S.Ct. 935, 939, 22 L.Ed.2d 162 (1969); *Cox v. Louisiana*, 379 U.S. 536, 554–55, 85 S.Ct. 453, 464–465, 13 L.Ed.2d 471 (1965); *Blasecki v. City of Durham*, 456 F.2d 87, 92 (4th Cir. 1972).

The second requirement—that the ordinance's time, place, and manner regulations be no more restrictive than necessary to serve the City's welfare interests—gives us more concern. In order to uphold the ordinance, we must find that its requirements

---

When contesting the constitutionality of a criminal statute, "it is not necessary that [the plaintiff] first expose himself to actual arrest or prosecution to be entitled to challenge [the] statute that he claims deters the exercise of his constitutional rights." [citations]. When the plaintiff has alleged an intention to engage in a course of conduct arguably affected with a constitutional interest, but proscribed by a statute, and there exists a credible threat of prosecution thereunder, he "should not be required to await and undergo a criminal prosecution as the sole means of seeking relief." [citation]. *Id.*

The plaintiffs allege that individuals were threatened with arrest if they violated the picketing ordinance during the demonstrations and that they wish to demonstrate in the future. These allegations are sufficient to give the plaintiffs standing to sue for declaratory and injunctive relief.

**6.** It is well settled by the Supreme Court that picketing and parading, although not a form of pure speech, "constitute methods of expression, entitled to First Amendment protection." *See, e. g., Shuttlesworth v. City of Birmingham*, 394 U.S. 147, 152, 89 S.Ct. 935, 939, 22 L.Ed.2d 162 (1969).

concerning the number and spacing of demonstrators, and sign and stave size, have been carefully tailored to the locality. "The nature of a place, 'the pattern of its normal activities, dictate the kinds of regulations of time, place and manner that are reasonable.'" *Grayned v. City of Rockford*, 408 U.S. at 116, 92 S.Ct. at 2303 (footnote omitted). The law does not contemplate deference to a city council's judgment of what restrictions are reasonable but requires that courts make an independent evaluation, the crucial inquiry being "whether the manner of expression is basically incompatible with the normal activity of a particular place at a particular time." *Id.* That inquiry in turn requires careful consideration of highly particularized facts, such as the length or lengths of city blocks, sidewalk widths, and traffic patterns at various times and places around town. *See, e. g., Davis v. Francois*, 395 F.2d 730 (5th Cir. 1968); *see also Baldwin v. Redwood City*, 540 F.2d 1360 (9th Cir. 1976), *cert. denied*, 431 U.S. 913, 97 S.Ct. 2173, 53 L.Ed.2d 223 (1977).

On such matters the record in the case before us is bare. We thus have no means by which to determine whether the ordinance presents the least restrictive alternative for promoting local safety and welfare. Because development of such facts is critical to a determination of the reasonableness of the ordinance, the grant of summary judgment to the City was erroneous, and the claim must be remanded to the district court.

### III.

■ We next confront the claim of the fire department officers that the fire chief's statement to them concerning protest activities is on its face an unconstitutionally vague and overbroad expression of municipal policy[7] and that it has deterred them in the exercise of their First Amendment rights.

The statement, allegedly made at the request of City Manager Wells, reads:

Gentlemen:

By virtue of your position as officers, you are leaders and supervisors in the Hickory Fire Department, as outlined by your job descriptions in the Personnel Ordinance. It has become necessary that I advise each of you of this responsibility. I am also asking you to pledge your loyal support to me and the City of Hickory. As officers, I feel that it is necessary that you be willing to pledge and show this support. That you will not in any manner disrupt the normal operations of this department by a slow-down, walk-out, picket, or any other method of disruption.

If you cannot give me your pledge, then I feel it is proper for me to request your resignation effective immediately. It is important that you understand that failure to comply with my request and assume the active role of an officer of this department will, in my opinion, be committing a dismissal offence [sic].

Do I have your pledge of support regarding this matter?

We find the district court's grant of summary judgment to the City on this claim erroneous because of two unresolved factual matters. First, it is not established in the record whether, as plaintiffs seem to allege, the chief's statement is an expression of a municipal policy currently in effect. If it is, then analysis of the statement for vagueness and overbreadth would be appropriate.[8] The second unresolved factu-

---

7. Although the complaint does not spell out this claim with crystal clarity, we broadly construe plaintiffs' allegation that department officers "may be terminated ... or not promoted, or suffer other job related penalties merely for exercising [First Amendment] rights" to mean that plaintiffs allege and believe that the chief's statement reflects an ongoing policy.

8. We note that the vagueness and overbreadth challenge here is directed at a municipality's policy and not at an ordinance or statute. That, however, is of little significance, as a governmental policy which threatens economic reprisal in the form of job loss has the potential to chill protected First Amendment activity in much the same way as does the threat of criminal sanctions. *Cf. National Association of Letter Carriers v. Blount*, 305 F.Supp. 546 (D.D.C. 1969), *appeal dismissed*, 400 U.S. 801, 91 S.Ct. 7, 27 L.Ed.2d 33 (1970) (oath requiring public employees to promise to refrain from striking and from belonging to an organization asserting right to strike held unconstitutional).

al issue is whether any of the officers have been unlawfully deterred or "chilled" in the exercise of First Amendment freedoms because of the statement. If an officer could show such deterrence, he might well be entitled to relief. *See generally* S. Nahmod, Civil Rights & Civil Liberties Litigation § 4.06 (1979). Accordingly, this claim is also remanded to the district court.

### IV.

Plaintiffs' final claim concerns the removal of the Association's charter from a wall in the fire station. They allege that, in June 1979, the chief violated the First Amendment by ordering that the Association remove its charter from the wall. The City, in contrast, denies the allegations and argues that the charter was removed by force of a previous agreement that it come down after being displayed for six months.

We believe that the charter may be a form of protected speech. *See Franceschina v. Morgan,* 346 F.Supp. 833 (S.D.Ind. 1972) (constitution of the United Farm Workers Union held to be protected speech). The record does not establish, however, the prior use, if any, of the fire station wall for the display of written communication, *see Connecticut State Federation of Teachers v. Board of Education Members,* 538 F.2d 471 (2d Cir. 1976), or the circumstances of the charter's installation and removal. Because of the potential relevance of that information to the question whether the charter's removal violated the First Amendment, remand of this matter is also necessary.

### V.

In light of the views expressed herein, we find the grant of summary judgment to the City to have been inappropriate.

*REVERSED AND REMANDED.*